NO. 8024. STATE OF LOUISIANA

LUFROID LE BLANC
 COURT OF APPEAL
 VS

GODCHAUX CO, INCORPORATED. PARISH OF ORLEANS

------------------------------------

OPINION.

By his Honor John St. Paul.

Plaintiff, a cane-grower, sold certain sugar cane to defendant, a sugar manufacturer, at a price to be fixed by "the weekly average price of Prime Yellow Clarified Sugar as sold on the New Orleans sugar market during the week of delivery; said weekly average price to be established by the Secretary of the Louisiana Sugar and rice Exchange."

Defendant paid on a basis of $8.30 per hundred pounds; but plaintiff claims the basis of settlement should have been $8.50 per hundred pounds. And the controversy grows out of a certain"allowance" of twenty points (equal to 20 cents per hundred pounds) made to certain "distributors." If these twenty points were allowed, and lawfully allowed, to the actual purchaser of the sugar, then plaintiff's claim is unfounded; but if the twenty points were allowed to brokers for procuring sales, or were unlawfully allowed to the purchasers, then plaintiff should recover.

I.

The Secretary aforesaid certified, by circular letter distributed generally, that the average price during the week was $8.50; but added a note as follows;

531

"Note; To effect sales x x x an allowance from the above prices of an average of twenty points has been made this week to distributors, in accordance with section 2, Circular 11, Louisiana Sugar Committee."

The section referred to is found in the rules established by the "Louisiana Sugar Committee, of the U. S. Food Administration," and reads as follows;

"Rule 2; Any producer may secure the services of a sugar dealer or broker to sell or distribute his sugar under the rules and regulations of the Federal Food Administration, and may pay therefor any reasonable compensation not to exceed 25 cents per hundred pounds. Any broker or sugar dealer employed by the producer to dispose of his sugar shall not be permitted to divide his compensation or brokerage with, or pay any part of same, to the purchaser to whom he sells."

## II.

The authority of the Louisiana Sugar Committee is derived from a certain agreement between Herbert Hoover, United States Food Administrator, and the sugar manufacturers who are therein styled "the producer",; the declared purpose of said agreement being"to prevent unjust, unreasonable, unfair and wasteful commissions, profits and practices," and to regulate the sale and distribution

of sugar through a committee styled the "Louisiana Sugar Committee," having authority to "superintend the distribution of Louisiana sugar."

### III.

The agreement itself provides, in substance;

L. That the producer shall "observe, respect and be governed by, any and all orders and regulations" prescribed by said Sugar Committee.

2. That the basic price of sugar shall be that price "which is then determined by the U. S. Food Administrator x x x as the maximum price which may be charged by refiners x x."

3. That unless the Sugar Committee permits the sale at a lower price by reason of deterioration, or sets a lower price for any or all goods "the producer will sell direct consumption sugar x x x at not more than such price as is found to be just and fair by the U. S. Food Administrator, hereafter called the maximum price." and the Food Administrator thereupon agrees not to fix the price lower than a certain point, not material to the issue herein.

4. That the producer agrees that the Sugar Committee may fix a price not greater than the maximum price by the U. S. Food Administrator, and thereafter the producer will sell his sugar "at the price named, until changed."

5. The other provisions of the contract have no bearing on this controversy.

IV.

In this agreement (of which the foregoing is as fair an analysis as we know how to make) we see nothing but a simple agreement that the Food Administrator, in order to prevent "unjust, unreasonable, unfair and wasteful commissions, profits and practices," might fix a maximum price for sugar; at which price, as a maximum, the producer agreed to sell; unless the maximum be lowered, whereupon the producer agreed to accept such lower price, also as a maximum.

But we see nothing therein which forbids the producer to sell for a price below the maximum. The manifest purpose of the contract was to prevent profiteering in sugar; there is no indication that its purpose was to uphold the price.

Hence we conclude that there was nothing in this contract which made it unlawful for a producer to sell for a price below the maximum (At that time fixed by the Committee at 8.50).

V.

As to the certificate of the Secretary of the Exchange, the defendant claims that it plainly shows that the "twenty points allowed from the price" to distributors, went to the purchaser, or jobber, called a distributor; and moreover

534

adduced proof that such was the actual fact.

On the other hand plaintiff claims that the certificate clearly shows that the "twenty points allowed the distributor," went to the broker employed by the seller "to sell or distribute his sugar"; and hence objected to any evidence tending to show that the facts were otherwise.

The trial judge thought also that the certificate needed no explanation, and hence excluded oral evidence as to the facts. But he accepted defendant's understanding thereof, rendering judgment accordingly; and my collegue Judge Dinkelspiel (Judge Claiborne being absent) agrees wholly with the District Judge.

For myself I think that if I <u>must</u> interpret the certificate without recourse to oral testimony as to the ## actual facts, then I cannot but agree that the interpretation given it by the trial judge and by my collegue is most likely correct. For I know generally that wholesalers or jobbers, purchasing an article directly f·om the manufacturer for resale, are known in commercial circles as "distributors" of that article; but if brokers are ever so termed, I do not know it. Again a broker's compensation is usually called a commission or brokerage, and is not generally spoken of as "points allowed", which <u>points</u>, in the language of the exchanges, mean simply differences

in price, measured in certain established units. And finally, if the point allowed had been merely commissions paid, they would not have been mentioned in a circular intended only to show prices.

But I incline much to the view that testimony might have been admitted to show the actual facts, and such testimony, being in# the record, does show that the twenty points "allowed from the price", went to the purchasers of sugar, and not to the brokers; whose commissions were paid to them directly by the sellers and cut no figure whatever in fixing the price.

Incidently, it may be observed that the contract between plaintiff and defendant does not require that the average weekly price shall be established by the Secretary IN WRITING; and hence it is not strictly correct to say that oral evidence as to the price (his own, for instance) was not admissible under the contract.

Of course just why the Secretary worded his certificate as he did, and just why sugar was sold for a certain price less so many points, instead of for a fixed flat price, may continue matter for conjecture; but this does not alter the one main fact, that defendant paid plaintiff on the basis of prices actually and lawfully then prevailing on the exchange.

536

The judgment appealed from seems to us correct,

and accordingly;

Judgment Affirmed.